IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| GNC FRANCHISING LLC and GENERAL NUTRITION CORPORATION, <br><br> Plaintiffs, <br><br> v. <br><br> FRANK HUDDLESTON, <br><br> Defendant. | CIVIL ACTION No. _____ |

**PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR TEMORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Plaintiffs GNC Franchising, LLC ("GNC") and General Nutrition Corporation, by and through their undersigned counsel, file the following brief in support of its motion for temporary restraining order and preliminary injunction.

**I.   INTRODUCTION**

This case involves the termination of a franchise agreement between the GNC and Defendant by which Defendant had operated a GNC-brand vitamin and nutrition retail store in Centerville, Ohio. The franchise agreement was terminated by GNC because Defendant sold products banned by both the Federal Food and Drug Administration and GNC.

Despite the lawful termination of the franchise agreement, Defendant has refused to surrender possession of the store operated thereunder.  Defendant is unlawfully using the trademarks and other proprietary information belonging to GNC that were licensed to him under the franchise agreement and GNC is being irreparably harmed as a matter of law. Accordingly, this Court should issue an order compelling Defendant to immediately cease and desist in the operation of his GNC franchised store and further compelling Defendant to peacefully cooperate in the post-termination conversion obligations detailed in the franchise agreement.

1

2

## II. STATEMENT OF FACTS

GNC, as the result of the expenditure of time, skill, effort and money, has developed and owns a unique and comprehensive system relating to the opening and operation of retail nutrition, health and and/or fitness stores ("General Nutrition Centers") which sell, among other things, vitamin and mineral supplements, sports nutrition products, herbs, health foods, cosmetics and miscellaneous health care products, diet products, sports accessories, fitness products and specialty workout apparel and which are staffed by employees dedicated exclusively to serving customers for these products and services (hereinafter "the System"). (Appendix, Exhibit 5, Declaration of Beth Kitchen at ¶ 3).[1]

GNC identifies the System by means of certain trademarks, trade names, service marks, logos, emblems and other indicia of origin, including, but not limited to the GNC®, GENERAL NUTRITION CENTER®, and GNC LIVE WELL® marks, and such other names, service marks, and trademarks as are designated by GNC for use in the System ("the Proprietary Marks"). (Appendix, Exhibit 5 at ¶ 4). GNC awards franchises to carefully screened and qualified individuals and/or business entities to operate GNC General Nutrition Center® stores on a nationwide basis and pursuant to the terms of a comprehensive franchise agreement. (Appendix, Exhibit 5 at ¶ 5).

### A. The Franchise Agreement

On July 10, 2000, Defendant executed a franchise agreement with GNC to operate a store located at Cross Pointe Center, 101 E. Ales-Bell Road, Centerville, OH 45459 (the "Franchise Agreement"). (Appendix, Exhibit 1). On September 29, 2000, Defendant executed a sublease

---

[1] GNC has filed an "Appendix of Evidence" in support of its motion for temporary restraining order and preliminary injunction.

with General Nutrition Corporation with respect to his GNC store (the "Sublease"). (Appendix, Exhibit 2).

The Franchise Agreement provides, with respect to the Proprietary Marks, *inter alia*, that:

> Franchisee expressly understands and acknowledges that:
>
> As between the parties hereto, [GNC] has the exclusive right and interest in and to the Proprietary Marks and other marks proprietary to [GNC] and the goodwill associated with and symbolized by them.
>
> Franchisee's use of the Proprietary Marks and other marks proprietary to [GNC] pursuant to this Agreement does not give Franchisee any ownership interest in or to such marks and all goodwill arising from Franchisee's use of the Proprietary Marks and other marks proprietary to [GNC] in its franchised operation under the System shall inure solely and exclusively to [GNC's] benefit, and upon expiration or termination of this Agreement and the license herein granted, no monetary amount shall be assigned as attributable to any goodwill associated with Franchisee's use of the System or the Proprietary Marks.

(Appendix, Exhibit 1 at §§ VIII.C.1 and 2).

The Franchise Agreement further provides that Defendant shall refrain from performing "directly or indirectly, any other act injurious or prejudicial to the goodwill associated with Franchisor's Proprietary Marks and the System." (Appendix, Exhibit 1 at § XVII.B.1). The Franchise Agreement also provides that "Franchisee acknowledges that . . . Franchisee's violation of the terms of this Section XVII would result in irreparable injury to [GNC] for which no adequate remedy at law may be available, and . . . Franchisee accordingly consents to the issuance of, and agrees to pay all court costs and reasonable attorney's fees incurred by [GNC] in obtaining an injunction prohibiting any conduct by Franchisee in violation of the terms of this Section XVII." (Appendix, Exhibit 1 at § XVII.G).

3

\4740052.1

With respect to termination, the Franchise Agreement provides that GNC has the right to terminate the agreement immediately and without an opportunity to cure if the Franchisee "fails to comply with the covenants in Section XVII.B." (Appendix, Exhibit 1 at § XV.B.6).

Upon termination of the Franchise Agreement, Defendant is obligated to, *inter alia*, immediately cease operating the business franchised to him by GNC; immediately cease to use any of the Proprietary Marks licensed under the Franchise Agreement; immediately turn over to GNC all Manuals and related documents owned by GNC and used in the operation of the GNC store; and grant GNC the right to purchase all inventory and merchandise from the store. (Appendix, Exhibit 1 at § XVI).

In the event GNC obtains injunctive relief to obtain Defendant's compliance with Section XVI, Defendant is obligated to pay all costs and expenses, including reasonable attorney's fees, incurred by GNC. (Appendix, Exhibit 1 at § XVI.G).

Finally, the Franchise Agreement imposes upon Defendant a covenant not to compete, which provides, in pertinent part, as follows:

> Except as otherwise approved in writing by [GNC], for a continuous uninterrupted period commencing upon the expiration or termination of this Agreement, and continuing for one (1) year thereafter, regardless of the cause for termination and regardless of which party terminates the Agreement, Franchisee shall not, either directly or indirectly, for itself, or through, on behalf of, or in conjunction with any person, persons, partnership, corporation or limited liability company own, maintain, advise, help, invest in, make loans to, be employed by, engage in, or have any interest in any direct marketing or retail business that offers for sale goods or services similar to those distributed to or offered at the Store and in the case of a retail business, one which is located within the Site Selection Territory or the Protected Territory or located within five (5) miles of the Approved Location or any General Nutrition Center® or any other retail outlet which is owned by [GNC] or an affiliate of [GNC].

(Appendix, Exhibit 1 at § XVII.B.2).

\4740052.1

The Sublease for the Defendant's Store provides that upon "any default by Sublessee or any corporation, limited liability company or limited partnership owned or controlled by franchisee under any franchise agreement with GNC Franchising, Inc., a wholly owned subsidiary of [General Nutrition Corporation's] parent company, for the Premises or any default by Sublessee under any of the terms of the Overlease, this Sublease shall be subject to termination immediately upon [General Nutrition Corporation's] written notice to Sublessee." (Appendix, Exhibit 2 at § 15). The Sublease for Defendant's Store further provides that if the Defendant's "franchise agreement is terminated, then [General Nutrition Corporation], besides other rights or remedies it may have, shall have the immediate right of re-entry and may remove all persons and property from the Premises . . . [.]" (Appendix, Exhibit 2 at § 15).

**B.     The Material Breaches of the Franchise Agreement**

GNC contracts with several companies to perform "mystery shops" at GNC franchise stores to ensure that the stores are in compliance with GNC's policies and to otherwise ensure a satisfactory customer experience. (Appendix, Exhibit 6, Declaration of Preston Foster at ¶ 5). One of the companies with which GNC contracts to perform mystery shops is Shop'n Chek. (Appendix, Exhibit 6 at ¶ 6).

On August 30, 2007, a Shop'n Chek shopper, Linda Inskeep, visited the Defendant's GNC store to conduct a mystery shop. (Appendix, Exhibit 6 at ¶ 7). Mrs. Inskeep completed an evaluation following the mystery shop at Defendant's store. (Appendix, Exhibit 3 and Exhibit 6 at ¶ 8).

At Defendants' store, Mrs. Inskeep had discussions with a sales associate regarding the availability of products which contained ephedrine. (Appendix, Exhibit 6 at ¶ 9). The sales representative informed Mrs. Inskeep that ephedrine-containing products were available for sale.

\4740052.1

(Appendix, Exhibit 6 at ¶ 10). The sales associate sold Mrs. Inskeep a bottle of Zenalean Pro Caps, a product which contains Ma Huang, which is an ephedrine alkaloid. (Appendix, Exhibit 6 at ¶ 11).

Mrs. Inskeep's evaluation was provided to GNC which thereby became aware that Defendant was selling products containing ephedrine at their store. (Appendix, Exhibit 6 at ¶ 12). On September 5, 2007, Marty Gamache, a GNC employee, shopped at Defendant's store, at which time a sales associate sold a bottle of Zenalean Pro Caps to the him. (Appendix, Exhibit 6 at ¶¶ 13-24).

By regulation, dietary supplements containing ephedrine alkaloids (also known as ephedra) are considered "adulterated" for purposes of the Federal Food, Drug and Cosmetic Act. *See* 19 C.F.R. § 119.1. The introduction into interstate commerce of any adulterated food is prohibited by the Federal Food, Drug and Cosmetic Act and such introduction can be remedied by seizure, injunction or monetary penalties. *See* 21 U.S.C. §§ 331-334.

Defendant, along with GNC's other franchisees, had been informed numerous times that ephedra was an ingredient that was unapproved for sale in all GNC stores and that the sale of ephedra-containing products was grounds for immediate termination of the franchise. (Appendix, Exhibit 5 at ¶ 20).

Because Defendant was offering products for sale to the public that contained ingredients that had been banned by the Food and Drug Administration and by GNC, and because this conduct was injurious and/or prejudicial to the goodwill associated with the Propriety Marks and the GNC System, GNC terminated the Franchise Agreement for the Defendant's store on September 5, 2007. (Appendix, Exhibit 4 and Exhibit 5 at ¶¶ 18-19).

\4740052.1

Despite the termination of the Franchise Agreement, Defendant has refused to comply with the post-termination obligations in the Franchise Agreement, has refused to turn over the franchised location to GNC, and continues to operate his store as though the Franchise Agreement had not been terminated. (Appendix, Exhibit 5 at ¶¶ 21-22).

On September 10, 2007, GNC commenced a lawsuit against Defendant in this Court asserting claims of breach of contract, violation of the Lanham Act and breach of the covenant not to compete. GNC also filed a motion for temporarily restraining order and preliminary injunction on September 10, 2007 seeking an order enjoining Defendant from using GNC's Proprietary Marks by the continued operation of their store despite the termination of their Franchise Agreement and an order compelling Defendant to comply with all post-termination obligations in the Franchise Agreement.

### III. ARGUMENT

#### A. Legal Standard

The standard for a temporary restraining order is the same as for a preliminary injunction. *Nutrasweet Co. v. Vitmar Enterprises, Inc.*, 112 F.3d 689, 693-94 (3d Cir. 1997). When considering whether a preliminary injunction should be granted or a temporary restraining order should issue, the district court must take into account the following four considerations:

(1) whether the movant has shown a reasonable probability of success on the merits;

(2) whether the movant will be irreparably harmed by denial of the relief;

(3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and

(4) whether granting the preliminary relief will be in the public interest.

*ACLU v. Reno*, 217 F.3d 162, 172 (3d Cir. 2000). A district court should endeavor to balance these four factors to determine whether an injunction should issue. *See BP Chemical Ltd. v. Formosa Chemical & Fibre Corp.*, 229 F.3d 254, 263 (3d Cir. 2000). Pursuant to this well settled standard, GNC's motion for temporary restraining order and preliminary injunction must be granted.

   **B.** **GNC has a reasonable probability of success on its claims for trademark infringement, dilution, tarnishment and unfair competition.**

Federal trademark infringement, 15 U.S.C. § 1114, and federal unfair competition, 15 U.S.C. § 1125(a)(1)(A), are measured by identical standards. *See A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210 (3d Cir. 2000). To prove either, a plaintiff must demonstrate that: (1) it has a valid and legally protectable mark; (2) it owns the mark; and (3) the defendant's use of the mark to identify goods or services causes a likelihood of confusion. *See id*.

Ownership of a valid and legally protectable mark is proven where the mark is federally registered and has become "incontestable" under the Lanham Act. *See Fisons Horticulture, Inc. v. Vigoro Industries, Inc.*, 30 F.3d 466, 472 (3d Cir. 1994); 15 U.S.C. §§ 1058, 1065. A trademark is incontestible after the owner declares in an affidavit to the Commissioner of Patents that the mark has been registered, has been in continuous use for five consecutive years and that there has been no adverse decision concerning the registrant's ownership or right to registration. *Fisons*, 30 F.3d at 472 n. 7; 15 U.S.C. § 1065(3).

There can be no dispute in this case over whether GNC owns GNC™ and or whether GNC™ is a valid and legally protectable mark. (Appendix, Exhibit 5 at ¶ 4); *GNC Franchising LLC v. Masson*, 2005 WL 3434076 (W.D. Pa. 2005) ("It is clear that GNC owns the marks at issue here because the marks are federally registered.").

8

\4740052.1

Therefore, this case turns on the issue of whether a likelihood of confusion will result from Defendant's continued use of the GNC marks following the termination of the franchise agreement. "To prove likelihood of confusion, plaintiffs must show that 'consumers viewing the mark would probably assume the product or service it represents is associated with the source of a different product or service identified by a similar mark.'" *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 280 (3d Cir. 2001).

There is no doubt that GNC properly and lawfully terminated the Franchise Agreement. As noted, the Franchise Agreement was terminated because Defendant repeatedly sold products that contained ingredients banned by the Food and Drug Administration and by GNC. GNC's reputation and the value of its proprietary marks would be injured if one of its franchisees was caught selling product banned by the FDA. Defendant, along with GNC's other franchisees, had been informed that the sale of banned ephedrine-containing products constituted conduct that would prejudice the goodwill associated with GNC's marks.

Because GNC lawfully and properly terminated Defendant's Franchise Agreement, the likelihood of confusion created by Defendant's continued operation of GNC store is obvious – Defendant is holding himself out to be a GNC franchisee despite the fact that his franchise agreement has been terminated and that he has no right to use GNC's Proprietary Marks.

In a similar case involving the termination of another GNC franchise, this Court noted the likelihood of confusion caused by a terminated franchisee's continued use of GNC's marks. *See GNC Franchising*, 2005 WL 3434076 at *2 (noting "consumers would likely be confused concerning the source of GNC-marked products and stores operated by [the terminated franchisee.]"). Indeed, Defendant is operating the store as though the termination was never issued, and there is absolutely no reason to believe that the consuming public would have any

9

reason to know that Defendant is no longer a GNC franchisee entitled or authorized to use the Proprietary Marks in the operation of the store.

> **C. GNC will be irreparably harmed by denial of the relief if this Court does not issue an Order temporarily restraining Defendants' infringing conduct.**

It is well settled in the Third Circuit that in the context of trademark disputes, "trademark infringement amounts to *irreparable injury as a matter of law*." *Gucci Am., Inc. v. Daffy's, Inc.*, 354 F.3d 228, 237 (3d Cir. 2003) (emphasis added); *Opticians Assoc. of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 195 (3d Cir. 1990). The *Opticians* court concluded that infringement constitutes a *per se* injury "even if the infringer's products are of high quality." *Id*. In *Opticians*, the court reasoned that infringement inhibits the owner's ability to control its own marks, which in turn creates the *potential* for damage to its reputation. *Id*. "Potential damage to reputation constitutes irreparable injury for the purpose of granting a preliminary injunction in a trademark case." *Id*. Additionally, this Court has previously held that a terminated franchisee's continued use of GNC's marks constitutes irreparable injury as a matter of law. *See GNC Franchising*, 2005 WL 3434076 at *2.

Even if this Court were not compelled by controlling Third Circuit authority to recognize that Defendant's infringing conduct amounts to irreparable injury as a matter of law, it is clear nonetheless that his actions create a substantial risk of irreparable harm to GNC's reputation in the community. A plaintiff has suffered irreparable injury when its harm cannot be remedied by damages. *See Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 91 (3d Cir. 1992); *Opticians Assoc. of Am.*, 920 F.2d at 195. Grounds for finding irreparable injury include loss of control of reputation, loss of trade, and loss of good will. *Id*. GNC has suffered loss of control of its reputation, loss of trade, and loss of good will as result of Defendant holding himself out to be a GNC franchisee despite the fact that his franchise agreement has been terminated, and, as long as

he is in operation, GNC's reputation is in the hands of an individual with a proven propensity to offer banned product for sale to the public. GNC's reputation and goodwill would certainly be damaged if Defendant's conduct was made widely known.

GNC need not prove that Defendant will again offer banned product for sale to the public to prove that it will be irreparably harmed absent an order compelling Defendant to cease and desist in the operation of the GNC store—the irreparable harm is presumed, as a matter of law, because of Defendant's unauthorized and continuing use of GNC Proprietary Marks and intellectual property.

> D.  **Granting the Temporary Restraining Order will not harm Defendants more than the denial would harm GNC.**

In deciding whether injunctive relief is appropriate, the third task a trial court must undertake is to balance the hardships to the respective parties. A basic purpose behind the balancing analysis is to ensure that the issuance of an injunction or restraining order would not harm the infringer more than a denial would harm the mark's owner. *Opticians Assoc. of Am.*, 920 F.2d at 197.

As GNC's termination of the Franchise Agreement was lawful, Defendant will not be harmed by an order compelling him to cease operations at the store. Defendant has no right to operate a GNC store using GNC's Proprietary Marks and the restraining order sought by GNC will merely require Defendant to comply with the post-termination obligations set forth in the Franchise Agreement (*i.e.*, to do what he is already contractually obligated to do). Since GNC will be irreparably harmed absent the issuance of the equitable relief it now seeks, this prong of the test weighs heavily in GNC's favor.

\4740052.1

### E. Granting GNC's Motion for Temporary Restraining Order temporarily restraining Defendants' infringing conduct will be in the public interest.

The final consideration in the analysis is whether the issuance of a temporary restraining order / preliminary injunction furthers the public interest. Where the plaintiff has demonstrated a likelihood of success on the merits, the public interest leans even more toward granting the injunction. *See Novartis Consumer*, 290 F.3d at 597. As discussed above, GNC has demonstrated the likelihood of success on its infringement, dilution and trademark claims against Defendant.

As the Third Circuit recognized, "[p]ublic interest can be defined a number of ways, but in a trademark case, it is most often a synonym for the right of the public not to be deceived or confused." *Opticians Assoc. of Am.*, 920 F.2d at 197-98 (finding that because a likelihood of consumer confusion created by the concurrent use of the marks at issue, it followed that if such use continues, the public interest would be damaged); *Bill Blass, Ltd. v. Saz Corp.*, 751 F.2d 152, 156 (3d Cir. 1984) (noting that there is a public interest in the protection of the trademark and to avoid confusion in the public); *SK&F, Co. v. Premo Pharmaceutical Laboratories*, 625 F.2d 1055, 1057 (3d Cir. 1980) ("preventing deception of the public is itself in the public interest").

Because of the likelihood of confusion created by Defendant's continued operation of store using the GNC marks, the public interest will be served by the issuance of the temporary restraining order. Additionally, this Court has previously held that the public interest would be served by an injunction preventing a terminated GNC franchisee from continuing to use GNC's marks. *See GNC Franchising*, 2005 WL 3434076 at *3 (noting the public interest "factor weights in favor of granting GNC's request for injunctive relief so that consumers will not be confused by the concurrent use of the GNC marks by both viable GNC franchises and [Defendant's] terminated franchises.").

12

\4740052.1

## IV. CONCLUSION

Based on the foregoing, Plaintiffs respectfully requests that this Court grant their motion for a temporary restraining order and schedule a hearing on the motion for preliminary injunction at its earliest convenience.

Respectfully submitted,

Dated: September 10, 2007

/s/ Kevin Batik
Gerald J. Stubenhofer
Pa. Id. No. 72921
Kevin Batik
Pa. Id. No. 89209
McGuireWoods LLP
Dominion Tower, 23rd Floor
625 Liberty Avenue
Pittsburgh, Pennsylvania 15222
(412) 667-6000

\4740052.1